# United States Court of Appeals
FOR THE EIGHTH CIRCUIT

No. 04-1607

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| James Hull, | * | |
| | * | CR 02-220 JMR/FLN |
| Appellant. | * | |

Submitted: June 20, 2005
Filed: August 19, 2005

Before MELLOY, HEANEY, and GRUENDER, Circuit Judges.

GRUENDER, Circuit Judge.

A jury found James Hull ("Hull") guilty of distribution of marijuana in violation of 21 U.S.C. §§ 841(b)(1)(a) and 846, and conspiracy to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(B). The district court[1] sentenced Hull to 188 months' imprisonment and ordered forfeiture of specified

[1]The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota.

SCANNED
SEP 19 2005
U.S. DISTRICT COURT ST. PAUL

assets pursuant to 21 U.S.C. § 853(a). Hull appeals, claiming numerous errors. For the reasons stated below, we affirm.

## I. BACKGROUND

On May 13, 2002, law enforcement officers in Minnesota arrested Daniel Connor ("Connor") after he delivered 484 pounds of marijuana to a Government informant. The marijuana was packaged in bricks, heat sealed and stored in several white cardboard cartons, each of which bore the same lot number.

After his arrest, Connor confessed to officers that the marijuana came from Hull, whom he knew as "Woody" and who had been Connor's marijuana source since 1996. Connor claimed that he and Hull developed a routine in which Connor would meet Hull in Golden Gate Park in San Francisco, California, on a Thursday to provide Hull the money for their next marijuana shipment. Over the next couple of days, Hull would then obtain the marijuana from his sources. The following Sunday, Hull and Connor would meet in the garage of Hull's sister Kathleen Valdez's house in San Bruno, California, for Connor to pick up the marijuana load.

At the direction of law enforcement, Connor placed recorded telephone calls to Hull to arrange another shipment of marijuana. Because the officers did not want to give Hull the agreed-upon price of $225,000 in cash, Connor attempted to convince Hull to exchange the cash for the marijuana at the same time. Hull refused and stated on tape that he had to have all "the books," meaning the money, before he could obtain the marijuana from his suppliers. Connor, who was in custody at the time of these recorded calls, convinced Hull to allow his "uncle" to deliver the cash for the marijuana to Golden Gate Park.

On July 11, 2002, Special Agent Thomas Billings ("Special Agent Billings") of the Minnesota Bureau of Criminal Apprehension met with Hull in Golden Gate

Park and gave Hull a backpack that purportedly contained $225,000 in cash for the next marijuana shipment. After Hull accepted the backpack and put it in his gray truck, he was arrested by other officers. Special Agent Billings advised Hull of his *Miranda* rights, and Hull initially declined to speak to the officers and requested a lawyer. Special Agent Billings then informed Hull that he was leaving to execute a search warrant at Hull's sister's residence in San Bruno, California, and left the scene.

A few minutes later, Hull asked one of the officers guarding him whether the officer knew San Francisco Police Officer Rick Valdez ("Officer Valdez"). Hull went on to say that Officer Valdez was his brother-in-law and that Officer Valdez's estranged wife lived at the San Bruno house where the search warrant was about to be executed. Officer Valdez was called to the scene, and Hull agreed to talk to him and another local officer, Officer Daniel Perea ("Officer Perea"), but would not talk to a federal Drug Enforcement Agency (DEA) agent who was present. After the DEA agent left, Officer Perea told Hull that if he had anything in the house that the residents did not know about, to protect his relatives, he should "be responsible for it and tell me about it." Hull admitted to Officer Valdez and Officer Perea that he was renting the garage at the San Bruno residence, and in it he had a heat sealer, packaging material and a safe containing $15,000 cash. Hull also gave the officers the combination to the safe. When asked whether he would cooperate against his marijuana suppliers, Hull responded, "I can't snitch."

Law enforcement officers executed the search warrant at Hull's sister's house in San Bruno. During the search, officers recovered $15,000 in U.S. currency from the safe to which Hull had given them the combination. They also seized an electronic money counter, two electric heat sealers used for packaging marijuana, a 200-pound capacity scale, a large amount of marijuana packaging material and 13 white cardboard boxes that each bore the exact lot number as the cardboard boxes containing the 484 pounds of marijuana seized from Connor in Minnesota two months earlier.

Officers also executed a search warrant at Hull's own residence in San Francisco. In Hull's bedroom they found a loaded handgun on the top of a night stand. They also found a loaded pistol in the next room and 50 newly planted marijuana plants in the bathroom.

## II. ANALYSIS

### A. Motion to Suppress

Hull contends that the district court erred in denying his motion to suppress the statements he made to Officer Valdez and Officer Perea after his arrest. Hull contends that law enforcement failed to honor Hull's invocation of his right to counsel when Special Agent Billings told Hull that he was leaving to execute a search warrant on Hull's sister's home and when Officer Perea told Hull that it was time to take responsibility for his actions. We disagree because neither of these statements constitutes a violation of Hull's rights under the Fifth and Fourteenth Amendments to the United States Constitution.

A defendant who is in custody and has invoked his right to counsel pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), may not be interrogated further by authorities, unless the defendant "initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). "Further, the communication initiated by the accused satisfies *Edwards* only if it relates to the investigation." *United States v. Valdez*, 146 F.3d 547, 551 (8th Cir. 1998). "Whether, as a matter of law, a defendant was deprived of his rights under the Fifth Amendment is a mixed question of fact and law that we review de novo." *United States v. Harris*, 221 F.3d 1048, 1051 (8th Cir. 2000).

We first consider whether Special Agent Billings's statement that he was leaving to search Hull's sister house constituted a custodial interrogation in violation

of Hull's invoked right to counsel. Interrogation under *Miranda* includes not only express questioning but also its functional equivalent, such as "any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) (footnotes omitted). Whether a particular statement constitutes an interrogation depends upon the circumstances of each case, but we generally do not find a mere factual statement to be an interrogation where it serves to inform the suspect as to the status of his case or the investigation into his activities. *United States v. Wipf*, 397 F.3d 677, 685 (8th Cir. 2005) (holding that an officer's post-invocation statement that he wanted to tell the defendant "the situation, and explain the charges against him" does not amount to custodial interrogation); *see also Arizona v. Roberson*, 486 U.S. 675, 687 (1988) (explaining that even after a suspect has requested counsel, police "are free to inform the suspect of the facts of a second investigation as long as such communication does not constitute interrogation"). Special Agent Billings's statement was merely a statement of fact concerning the status of the investigation against Hull and not a plea to Hull's conscience. *See Innis*, 446 U.S. at 302 (holding that there was no interrogation where nothing in the record suggested that the officers knew that the defendant was peculiarly susceptible to an appeal to his conscience). For these reasons, we hold that this statement was not an interrogation and does not implicate Hull's protections under *Miranda*.

We next consider whether Hull voluntarily initiated the conversation in which Officer Perea told Hull that he should "be responsible" for what officers might find in his sister's garage. Waivers of an invoked right to counsel "must be voluntary and must constitute a knowing and intelligent relinquishment of a known right." *United States v. Allen*, 247 F.3d 741, 765 (8th Cir. 2001), *vacated on other grounds by* 536 U.S. 953 (2002). Although Hull claims Officer Perea's statements were so coercive as to render his post-invocation admissions involuntary, those statements were made only after Hull asked to speak to Officer Valdez and agreed to speak only to Officer

Valdez and Officer Perea. Hull's previous invocation of his right to remain silent until he could consult an attorney indicates that he was aware of his rights. In addition, there is no evidence that any officers spoke to Hull prior to his decision to reinitiate conversation with law enforcement by asking whether anyone knew Officer Valdez. Once Officer Valdez arrived, Hull dictated the circumstances and content of their conversation by limiting to whom he would talk and refusing to answer questions about his sources. Even if Officer Perea's statements that Hull should "be responsible" were the functional equivalent of interrogation, those statements occurred only after Hull voluntarily and knowingly initiated contact with police, thereby waiving his invoked right to an attorney. *See Edwards*, 451 U.S. at 484-85. Because Hull initiated contact with authorities on a matter relating to their investigation, we hold that the district court did not err in denying Hull's motion to suppress his confession.

**B. Venue**

Hull argues that the district court erred in not granting either his motion to dismiss for want of proper venue or his motion to transfer the case to the Northern District of California. As it involves a question of law, we review de novo the district court's denial of a motion to dismiss for improper venue. *United States v. Cole*, 262 F.3d 704, 709-10 (8th Cir. 2001). We review the district court's denial of a motion to transfer venue to another district for abuse of discretion. *United States v. Maynie*, 257 F.3d 908, 915 (8th Cir. 2001).

First, Hull contends that venue was improper in Minnesota because the Government did not present sufficient evidence to establish either that Hull knew Connor was selling the marijuana in Minnesota or that he had any knowledge of Connor's alleged separate conspiracy to distribute marijuana in Minnesota. We disagree.

The United States Code provides that "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a); *see also* Fed. R. Crim. P. 18 ("Unless a statute or these rules permit otherwise, the Government must prosecute an offense in a district where the offense was committed."). In a conspiracy case, venue is proper "in any district in which any act in furtherance of the conspiracy was committed by any of the conspirators even though some of them were never physically present there." *United States v. Fahnbulleh*, 748 F.2d 473, 477 (8th Cir. 1984) (quoting *United States v. Diaz*, 685 F.2d 252, 255 (8th Cir. 1982)); *see also United States v. Cordova*, 157 F.3d 587, 597 (8th Cir. 1998).

The district court did not err in denying Hull's motion to dismiss for lack of venue. Hull's indictment alleged that he knowingly and intentionally conspired with Connor and others to distribute more than 1,000 kilograms of marijuana in the State and District of Minnesota. By providing Connor with large shipments of marijuana for distribution, Hull assumed the risk that Connor would take the marijuana to Minnesota and that Hull may be subject to prosecution there. Moreover, Connor was arrested in Minnesota while attempting to distribute the marijuana in Minnesota. Thus, an overt act in furtherance of conspiracy took place in Minnesota, making venue proper in the District of Minnesota. *See United States v. Romero*, 150 F.3d 821, 824-27 (8th Cir. 1998).

In addition, the Government presented sufficient evidence to establish that the conspiracy involving Hull and Connor was the same conspiracy as the conspiracy involving Connor and his Minnesota contacts. To show Hull belonged to a conspiracy to distribute a controlled substance, the Government must show that Hull intentionally entered the conspiracy and knew its ultimate goal. *United States v. Hill*, 410 F.3d 468, 471 (8th Cir. 2005). The Government, however, need not show each participant was involved in or even aware of all acts committed in furtherance of the

conspiracy. *Id.* Rather, "[t]he jury must simply be able to find that there was an overall agreement to pursue a common, unlawful end." *Id.* at 471-72. The Government presented clear evidence that Hull and Connor shared the agreed-upon common end of distributing marijuana. By selling the marijuana Connor received from Hull, Connor furthered the single conspiracy to which they both contributed.

Second, Hull also argues that the district court abused its discretion in declining to transfer venue to the Northern District of California for the convenience of the parties. *See* Fed. R. Crim. P. 21(b) ("Upon the defendant's motion, the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties and witnesses and in the interest of justice."). According to Hull, the only reason the Government possessed for trying his case in Minnesota was to gain a strategic advantage over him. Hull, however, presented no evidence that he would have any trouble transporting witnesses to Minnesota and no evidence that a trial in Minnesota would cause him financial hardship or disrupt his employment. Given that the Government's witnesses were in Minnesota and Hull presented no evidence of hardship, the district court did not abuse its discretion in refusing to transfer Hull's case. *See United States v. Green*, 983 F.2d 100, 103 (8th Cir. 1992) (holding that the district court did not abuse its discretion in denying a motion to transfer for convenience where the defendant had no witnesses that needed to travel and the Government had local witnesses).

**C. Jury Instruction**

Hull contends that the district court erred in not giving the jury his proposed jury instruction on multiple conspiracies. "Whether there was sufficient evidence to sustain . . . a multiple conspiracy instruction is generally a question of law subject to de novo review." *United States v. Hall*, 171 F.3d 1133, 1149 (8th Cir. 1999) (internal quotation omitted).

Hull's proposed instruction stated, "The conspiracy in this case involved a conspiracy to distribute marijuana in Minneapolis, Minnesota. If you find that the defendant did not knowingly agree to join this conspiracy to distribute marijuana in Minneapolis, Minnesota, you must find the defendant not guilty for the offense charged." In asking the jury to find that Hull intended for the marijuana to be distributed in Minnesota, this instruction depends upon the same flawed view of conspiracy law as Hull's venue argument addressed above. Thus, we hold that the district court did not err in declining to give this instruction.

**D. Cross-examination**

Hull argues that the district court abused its discretion in allowing the Government to insinuate during cross-examination that Hull was affiliated with gang members through a record company he briefly owned. We disagree.

Part of Hull's defense was that he had no reason to deal marijuana because he owned a number of income-producing businesses, including a record company. In his opening statement, Hull's attorney characterized the company's music as "hip-hop music." After Hull testified on direct examination about his record business, the Government introduced one of the company's CDs on cross-examination and asked Hull whether the music could be characterized as "gangster rap" rather than "hip-hop music." Hull agreed that "it could be." Hull also acknowledged that he was pictured on the CD cover with other people but denied knowing whether the other people were flashing gang signs. At that point, Hull's counsel objected on the ground that the questions were irrelevant and "character assassination." The district court overruled the objection but instructed the jury that the CD should not be considered for any purpose other than the defendant's acknowledgment that it could be characterized as gangster rap. Later, the district court ruled that the CD would not be evidence that went to the jury. During final instructions, the district court again instructed the jury

that the type of music Hull produced was not a basis for deciding whether the Government had proven the charges.

We review the district court's rulings on the proper scope of cross-examination for abuse of discretion. *United States v. Juvenile NB*, 59 F.3d 771, 778 (8th Cir. 1995). A district court has broad discretion in setting the limits of cross examination, and "[w]e give great deference to the trial judge who heard the evidence and determined whether the probative value of the evidence was sufficient to outweigh the danger of unfair prejudice." *United States v. Woodard*, 315 F.3d 1000, 1003 (8th Cir. 2003) (citing *United States v. Wallace*, 722 F.2d 415, 416 (8th Cir. 1983)). To reverse, "[t]he prejudicial impact of the evidence must be strong enough to deny the defendant a fair trial." *Woodard*, 315 F.3d at 1003.

As it related to Hull's testimony on direct examination, the Government's questioning regarding Hull's record business was within the proper scope of cross-examination. Fed. R. Evid. 611(b) ("Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness."). Although this Court has recognized the prejudicial potential of evidence regarding gang affiliation, *United States v. Bradford*, 246 F.3d 1107, 1117 (8th Cir. 2001), *overruled in part on other grounds by United States v. Diaz*, 296 F.3d 680 (8th Cir. 2002), the district court twice instructed the jury that the CD and Hull's admission that it could be considered "gangster rap" were not to be used to prove either Hull's association with a gang or his guilt in this case. Rather, the Government's questioning regarding Hull's music business and a CD it produced served to clarify the record and was not used to directly link Hull to gang activity. Thus, Hull suffered no unfair prejudice, and the district court did not abuse its discretion in allowing the Government to ask Hull about the CD on cross-examination.

### E. *Franks* Hearing

Hull next argues that the district court erred in refusing to grant him an evidentiary hearing to challenge alleged misstatements and omissions in the search warrant affidavit for Hull's residence and his sister's residence. We disagree.

In *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), the Supreme Court held that the Fourth Amendment entitles a defendant to an evidentiary hearing about the veracity of a search warrant affidavit if the defendant can make "a substantial preliminary showing" that the affiant intentionally or recklessly included a false statement in the affidavit. *See also United States v. Mathison*, 157 F.3d 541, 547-48 (8th Cir. 1998). To warrant a *Franks* hearing, the allegedly false statement must be "necessary to the finding of probable cause." *Franks*, 438 U.S. at 156; *see also United States v. Gleich*, 397 F.3d 608, 613 (8th Cir. 2005). We review the district court's refusal to call a *Franks* hearing for abuse of discretion. *United States v. Gabrio*, 295 F.3d 880, 882 (8th Cir. 2002).

In support of his motion for an evidentiary hearing, Hull alleged the following: (1) the affiant falsely stated that Hull's sister Jacqueline Hull owned or resided at the San Bruno residence to be searched, rather than his sister Kathleen Valdez; (2) the affiant incorrectly described the color of Hull's truck as green when it is silver; (3) the affiant failed to state that Connor had no track record of providing reliable information; (4) the affiant omitted information that would impeach Connor's credibility, such as the consideration he received for his cooperation; (5) the affiant stated that a particular conversation between Connor and Hull contained a discussion about marijuana that it actually did not; and (6) the statement that Hull was associated with a known California drug trafficker was irrelevant.

Hull failed to make the substantial preliminary showing required by *Franks* because each of Hull's claims involves statements that are either not actually false or

would not affect the district court's finding of probable cause. First, the search warrant affidavit only stated that "Hull's sister" resided in the house in San Bruno, and Hull is wrong in claiming that the affidavit named Jacqueline Hull. Second, although Hull did have a silver truck, the Government has shown that Hull owned two trucks, one of which was never found by law enforcement. Thus, either the missing truck was green or the Government was wrong about a detail that was insignificant for the district court's finding of probable cause. Third, the affidavit did not claim that Connor was a long-time informant. Instead, the affidavit made it clear that Connor was a first-time informant who gave information after being caught with a large load of marijuana. Fourth, given that the district court knew about Connor's arrest, the fact that the consideration he received was not detailed in the affidavit did not affect the district court's probable cause determination because that fact was easily inferred. Fifth, the transcripts of the recorded calls between Connor and Hull showed that the Government's characterization of those calls was accurate. Sixth, even if the information concerning Hull's association with a known drug trafficker was irrelevant, it did not affect the district court's finding of probable cause given the relevant information in the affidavit.

Therefore, we hold that the district court did not abuse its discretion in denying Hull's request for a *Franks* hearing.

### F. *Booker* Error

Lastly, Hull challenges the mandatory application of the sentencing guidelines under *United States v. Booker*, 125 S. Ct. 738 (2005). Because Hull failed to argue *Apprendi* or *Blakely* error or that the guidelines were unconstitutional before the district court, we review for plain error. *United States v. Pirani*, 406 F.3d 543, 549 (8th Cir. 2005) (en banc).

To establish plain error under *Pirani*, Hull bears the burden of demonstrating "a reasonable probability that he would have received a more favorable sentence with the *Booker* error eliminated by making the Guidelines advisory." *Id.* at 551. Hull fails to meet this burden because there is no indication in the record that, given broader discretion, the district court would have imposed a different sentence. *See, e.g., United States v. Light*, 406 F.3d 995, 1000 (8th Cir. 2005). Therefore, the district court did not commit reversible plain error in sentencing Hull under mandatory guidelines.

## III. CONCLUSION

For the reasons stated above, we affirm Hull's convictions for conspiracy to distribute marijuana and distribution of marijuana.

HEANEY, Circuit Judge, concurring.

I adhere to the view stated by Judge Bye in Pirani, that defendants who did not properly preserve their Booker claims in the district court are nonetheless generally entitled to resentencing under a constitutional regime. See United States v. Pirani, 406 F.3d 543, 562-67 (8th Cir. 2005) (en banc) (Bye, J., dissenting). Because a majority of our court has held to the contrary, however, I concur.

______________________________

A TRUE COPY OF THE ORIGINAL
MICHAEL E. GANS, CLERK
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
BY: Michael E. Gans